**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| GLOBAL ARCHERY PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:16-cv-00019-JVB-SLC |
| | ) | |
| ASHLEIGH RENEE  FIRGAIRA, | ) | |
| ARCHERY SPORTS, and ARCHERY | ) | |
| ATTACK | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS WITH
PREJUDICE PLAINTIFF'S SECOND AMENDED COMPLAINT UNDER FRCP
12(b)(2) AND ALTERNATIVE MOTION TO DISMISS WITH PREJUDICE
PLAINTIFF'S SECOND AMENDED COMPLAINT UNDER FRCP 12(b)(6)**

COME NOW Defendants, Ashleigh Renee Firgaira, Archery Sports, and Archery

Attack (collectively, "Archery Sports"), and move to dismiss Plaintiff's Second Amended

Complaint for want of personal jurisdiction pursuant to Federal Rule of Civil Procedure

12(b)(2) and for failure to state a claim pursuant to Rule 12(b)(6).  For the reasons stated

below, Archery Sports prays that its Motion to Dismiss be granted and that Plaintiff's

Second Amended Complaint be dismissed with prejudice.

### I.  STANDARD OF REVIEW

In deciding a motion to dismiss, a Court is required to determine whether the

complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief

that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell

Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court must assume as true all

***well-pleaded*** facts in the complaint, but need not presume truth as to "bare assertions"

1

that "amount to nothing more than a 'formulaic recitation of the elements'" of the claim. *Id.* at 681 (quoting *Twombly*, 550 U.S. at 555) (emphasis added). The Court need not, however, accept a fact as true unquestioningly simply because it is pleaded. *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011). The Court is entitled "to consider whether the events alleged could have happened . . . ." *Smith v. Medical Benefit Administrators Group, Inc.*, 639 F.3d 277, 281 (7th Cir. 2011). "[S]uppose some of the plaintiff's factual allegations are unrealistic or nonsensical and others not, some contradict others, and some are 'speculative' in the sense of implausible and ungrounded. The district court has to consider all these features . . . en route to deciding whether the complaint has enough substance . . . ." *Id.*

To survive a motion to dismiss, a complaint must "describe the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds on which it rests," and, further, must "provid[e] allegations that raise a right to relief above the speculative level." *Tamayo v. Blagoyevich*, 526 F.3d 1074, 1084 (7th Cir. 2008). Moreover, a plaintiff may not rely on inferences based on a selectively quoted document, where the full document tells a different story. *See, e.g.*, *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

## II.  PERTINENT ALLEGATIONS OF THE SECOND AMENDED COMPLAINT

### A.  Alleged Facts

This lawsuit is based on Plaintiff's contention that Archery Sports breached a supposed "Global License and Sourcing Agreement." (Second Amended Complaint, ("SAC") ¶ 1, at 1. The Second Amended Complaint alleges (in effect) that the

remaining[1] defendants Ashleigh Firgaira, Archery Attack, and Archery Sports are legally

indistinguishable, with Archery Attack and Archery Sports each being a d/b/a of a sole

proprietorship owned by Ashleigh.  (*Id.* ¶¶ 4-6, at 2).

Plaintiff alleges that the Agreement was breached in two ways.  First, Plaintiff alleges

that Archery Sports "breached" the Agreement by running an archery sports operation in

Australia in supposed violation of the Agreement's noncompetition clause.  (SAC ¶¶ 35-

42, at 8-10).   Second, Plaintiff alleges that Defendants breached the Agreement by

supposedly failing to comply with a return-of-materials clause when the Agreement

expired on January 1, 2016.  (*Id.* ¶¶ 43-49, at 10).

### B.  The Agreement

The Agreement at issue in this lawsuit is attached as Exhibit E[2] to the Second

Amended Complaint. [3]  (SAC Ex. E, Dkt. No. 10-5). The Agreement is on its face

between Plaintiff and Archery Sports, executed on Archery Sports' behalf by its business

manager Chris Firgaira.[4]  (*See* Archery Tag® License and Sourcing Agreement

---

[1] The parties have jointly moved to dismiss defendants Chris Firgaira, SEG Holdings Pty. Ltd., and Archery Attack Pty. Ltd. without prejudice. (Dkt. No. 23).

[2] Paragraph 1 of the SAC identifies the Agreement as Exhibit A.  However, the SAC correctly identifies Exhibit A (as well as Exhibits B through D) (Dkt. 10-1 to 10-4) as containing information about the Defendants.  (*See* SAC ¶¶ 5-8, at 2). Paragraph 11 and subsequent paragraphs of the SAC cite to Exhibit E as the Agreement.  The Agreement is provided as Exhibit D. (Dkt. 10-5).  The same agreement is also provided as Exhibit F (Dkt. 10-6), even though the Complaint identified Exhibit F as August 14, 2015 correspondence between Global and Chris Firgaira.  (SAC ¶ 23, at 5).

[3] Although evidence outside the four corners of the Complaint is typically not permitted in the context of a Rule 12(b)(6) motion to dismiss, an exception exists for documents" referred to in the complaint, provided [they are] concededly authentic [and] central to the plaintiff's claim."  *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002).  The "usual example" of such a document is "a contract, in a suit for breach of contract."  *Id.*

[4] Ashleigh Firgaira's Australian Business Number ("ABN") associated with Archery Sports and Archery Attack was active beginning on August 1, 2012.  Archery Sports was

("Agreement") at 12, Dkt. No. 10-5, 10-6).  The Agreement is a contract of adhesion, presented in non-negotiable form online, to be signed digitally or not at all.  (*Id.* at 1, 12-13).

The Agreement required Archery Sports to pay a "non-refundable" initial license fee, and then to pay annual "fees" every year thereafter.  (Agreement §§ 4.1-4.2, at 5).  Section 2.1 of the Agreement purports to grant a "non-exclusive, non-transferrable, non-assignable, non-sublicensable, limited, revocable license to operate and use the Archery Tag® System at a single location."  (*Id.* § 2.1, at 2).  The Agreement purports to license the use of a number of United States patents, trademarks, and marks to the "licensee."  (*Id.* §§ 2.2, 2.5, 2.6, at 2, 3).  The Agreement also promises that Plaintiff will provide marketing "data and advice."  (*Id.* § 5.1(c), at 6).

The Agreement prohibits the leasing or renting of Plaintiff's equipment to anyone other than the "licensee."  (Agreement § 2.7, at 3).  The Agreement also prohibits the "licensee" from using any archery sports equipment from any other supplier.  (*Id.* § 6.2, at 7).

The Agreement sets forth strict rules about how its licensees must conduct themselves with respect to archery sports.  Licensees are ***required*** to use Plaintiff's arrows, and no others.  (Agreement § 2.2, at 2).  Licensees are ***required*** to use "official certified Archery Tag® equipment" other than arrows, such as mask, and "not attempt to source equipment from another supplier."  (*Id.* § 6.2, at 7).  Licensees are ***required*** to use Plaintiff's claimed "Archery Tag" logo, including the ® registration designation, in "all promotional materials written or printed by Licensee."  (*Id.* § 2.6, at 3).   Licensees are ***required*** to

registered as a d/b/a of that ABN on February 26, 2015.  Archery Attack was registered

4

conduct archery sports recreational activities in accordance with Plaintiff's "mandatory specifications, standards, and operating procedures . . . set forth in the Archery Tag® Operations Manual . . . ." (*Id.* § 6.1, at 6). And, when the Agreement is terminated or expires, licensees are required to return Plaintiff's equipment and documentation at their own expense. (*Id.* § 3.5, at 5).

The core allegations in the Second Amended Complaint arise from Section 12.3, titled "Covenant Not to Compete":[5]

> For a period of three (3) years following the date of termination or expiration of this Agreement, whether by lapse of time or by other cause, Licensee shall not engage in any business involving the ownership or operation of a field in which the Archery Tag® System or similar archery sport (i.e., non-lethal combat archery) is played.

Agreement § 12.3; SAC §§ 32, 38-39, 42, at 7, 9-10.

### III. ARGUMENT

#### A.     This Court Lacks Personal Jurisdiction Over Defendants

The Second Amended Complaint does not articulate a legally sufficient or plausible basis for the exercise of personal jurisdiction over any Defendant. Ashleigh and Chris Firgaira are alleged to be citizens and residents of Australia. (SAC ¶¶ 3-4, at 1-2). Archery Sports and Archery Attack are alleged to be sole proprietorships located and operating in Australia, owned by Ashleigh. (*Id.* ¶¶ 5-6, at 2). S.E.G. Holdings Pty. Ltd. and Archery Attack Pty. Ltd. are Australian corporate entities located and operating in Australia. (*Id.* ¶¶ 7-8, at 2). The dispute relates to a contract facially executed by Chris

---

as another d/b/a on July 25, 2015.
   [5] This section is separate from the earlier Section 8 titled "Non-Compete," which prohibits a "licensee" from running any competing business during the term of the Agreement. (Agreement § 8.1, at 7). Plaintiff has not asserted any breach of Section 8.1 in the Second Amended Complaint.

Firgaira on behalf of Archery Sports as its business manager.  (*Id.*, Ex. E, at 12).

Nowhere in the Second Amended Complaint does the Plaintiff allege that any Defendant

has conducted any business within, or has any contacts with, the United States.

The Second Amended Complaint alleges only one basis for jurisdiction over Chris

Firgaira—that he signed the Agreement.  (SAC ¶ 11, at 3).  The Second Amended

Complaint alleges only one basis of jurisdiction for each Defendant other than Chris

Firgaira:  that "[t]his Court has personal jurisdiction over Ashleigh Firgaira, Archery

Sports, Archery Attack, S.E.G. Holding Pty. Ltd. and Archery Attack Pty Ltd because

they are all alter egos of Chris Firgaira."  (*Id.* ¶ 12, at 3).

On their fact, these allegations fail to make a plausible showing of personal

jurisdiction, particularly over Defendants living and doing business on the far side of the

world with no contacts with the United States.  The Agreement on its face was executed

by Archery Sports by its business manager Chris Firgaira.  (Agreement at 12).  But the

Second Amended Complaint alleges that Chris alone, and not Archery Sports, is the

contracting party.  (SAC ¶ 11 at 3 (characterizing "the License Agreement between

Global and Mr. Firgaira")).  Even if the Court is inclined to accept the Agreement as a

consent to its jurisdiction, the Second Amended Complaint on its face alleges that only

Chris is a party to that Agreement.  No alleged facts, and no legal authority, would

support the exercise of jurisdiction over any other Defendant.  And the Agreement itself

lists Archery Sports, not Chris, as the contracting party that has ostensibly agreed to the

jurisdiction of this Court.  Plaintiff's Second Amended Complaint is self-contradictory

and nonsensical on the critical issue of jurisdiction, and does not plausibly show that this

Court has jurisdiction over citizens and residents of Australia in this matter.

Further, even if the Court accepts the contradictory allegation that Chris should be held personally bound to the Agreement and that jurisdiction over all other Defendants somehow flows through Chris (as alter egos of Chris, SAC ¶ 12), Plaintiff has already agreed to dismiss Chris from this lawsuit and the parties have already filed a joint motion to dismiss him.[6]  (Dkt. No. 23).  Taking at face value the allegations that Chris is the only contracting party (SAC ¶ 11), and that the contract is the only basis of jurisdiction (*Id.*), Chris's voluntary dismissal by Plaintiff drives even deeper the absence of any coherent jurisdictional allegation.  *See, e.g.*, *Travelers Cas. and Sur. Co. of Am. v. Adecco USA Inc.*, No. 2:12-cv-416-TLS, 2013 WL 4776771, at *2 (N.D. Ind. Sept. 5, 2013) ("A plaintiff can also plead himself out of court if he pleads facts that preclude relief.").  This Court should dismiss the remaining Defendants in this case for want of personal jurisdiction.

## B.  Plaintiff Cannot Raise a Plausible Claim of Relief for Breach of the Covenant Not to Compete Because It Is Unreasonable

In the event that this Court determines that it has personal jurisdiction over some of all of the Defendants, this Court should alternatively dismiss the Second Amended Complaint as failing to raise a plausible claim for relief pursuant to Rule 12(b)(6).

Count I of the Second Amended Complaint alleges breach of Section 12.3 of the Agreement.  Section 12.3 contains a single obligation: that the contracting party "not engage in any business involving the ownership of a field in which the Archery Tag® System or similar archery sport (*i.e.*, non-lethal combat archery) is played."  Plaintiff

---

[6] For this reason, Chris Firgaira, S.E.G. Holdings Pty Ltd, and Archery Attack Pty Ltd are not included as movants in the instant Motion to Dismiss.  If for any reason, the Court does not grant the Joint Motion to Dismiss, Defendants Firgaira, S.E.G. Holdings Pty Ltd, and Archery Attack Pty Ltd would join in this Motion.

alleges that Defendants violated this prohibition.  For this claim to relief to satisfy *Twombly*, however, Section 12.3 must be enforceable under Indiana law.[7]  *See, e.g., Zimmer US Inc. v. Mire*, No. 3:16-cv-8, 2016 WL 3031079, at *6 (N.D. Ind., May 27, 2016) (considering the enforceability of a covenant not to compete and noting that a 12(b)(6) motion is appropriate to "test the law of the claim.") (citations omitted).

    To be enforceable, a covenant not to compete must be reasonable.  *See, e.g.*, *Central Indiana Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 729 (Ind. 2008).  Reasonableness is a question of law for the Court to decide.  *See, e.g.*, *Clark's Sales & Serv., Inc. v. Smith*, 4 N.E.3d 772, 780 (Ind. Ct. App.), *transfer denied*, 10 N.E.3d 1004 (Ind. 2014) (citing *Krueger*, 882 N.E.2d at 729); *E.T. Products LLC v. D.E. Miller Holdings, Inc.*, No. 2:13-cv-424-PPS, F. Supp. 3d, 2016 WL 51108, *3 (N.D. Ind. Jan. 4, 2016), *appeal pending*.

    "Covenants not to compete are in restraint of trade and are not favored by the law." *Burk v. Heritage Food Service Equipment, Inc.*, 737 N.E.2d 803, 811 (Ind. Ct. App. 2000).  Noncompetes are strictly construed against the covenantee.  *Id.*  If this Court "find[s] the covenant not to compete unreasonable under any set of facts, it will be deemed to be unenforceable."  *Young v. Van Zandt*, 449 N.E.2d 300, 304 (Ind. Ct. App. 1983).

    Indiana courts generally only countenance noncompetes in two contexts—in an employer/employee relationship, and ancillary to the sale of a business.  *E.T. Products*, 2016 WL 51108 at *3; *Dicen v. New Sesco, Inc.*, 806 N.E.2d 833, 842 (Ind. Ct. App. 2004), *aff'd in part, vacated in part, and remanded on other grounds*, 839 N.E.2d 684 (Ind. 2005).  While both types of noncompete are viewed with disfavor,

---

[7] Under Section 12.4 of the Agreement, Indiana law applies to the Agreement.

employer/employee noncompetes are more strictly evaluated because of the lack of "equality of bargaining power between the parties and the premium often paid [in the sale of business context] for an agreement not to compete." *E.T. Products*, 2016 WL 51108 at *2 (quoting *Dicen v. New Sesco, Inc*., 839 N.E.2d 684, 687 (Ind. 2005)).  In both the employer/employee context and the sale of business context, "[o]f primary importance is the question of whether the covenant not to compete is reasonable as to the covenantee and whether it is reasonable as to time, space and the activity restricted." *Id*. at *3 (citing *Fogle v. Shah*, 539 N.E.2d 500, 502 (Ind. Ct. App. 1989)).

The test used to determine the reasonableness of a noncompete depends on whether the noncompete is ancillary to employment (stricter) or to the sale of a business (less strict).  Defendants were unable to find any Indiana case where, as here, a covenant not to compete arose in a context other than ancillary to the sale of a business or an employment relationship.  At most, the Agreement could be considered analogous to an employment-based noncompete, since it shares little, if any, similarity with a sale-of-business agreement.

The Agreement itself is a take-it-or-leave-it contract of adhesion, not a freely negotiated arms-length agreement of the kind common to a sale of business.  Unlike a sale-of-business noncompete, the Agreement's noncompete is not based on any protectable interest Plaintiff acquired or purchased from the Defendant.  Rather, like an employment-based noncompete, the Agreement's noncompete clause is based on Plaintiff's supposed provision to the Defendants of access to certain rights and materials. The Court should accordingly evaluate the enforceability of this noncompete clause

(Agreement § 12.4, at 10).

9

under the test provided for employment-based agreement.  Regardless of which test this Court chooses to use, however, the outcome is the same: the noncompete is unenforceable.

> **1.** ***The Noncompete is Unreasonable under the Employment Test***

In the context of an employer/employee relationship, a noncompete is reasonable if:

> (1) the restraint is reasonably necessary to protect the employer

> (2) it is not unreasonably restrictive of the employee; and

> (3) it is not against public policy.

*Harvest Ins. Agency, Inc. v. Inter-Ocean Ins. Co*., 492 N.E.2d 686, 688-89 (Ind. 1986); *Young*, 449 N.E.2d at 304.

Section 12.3 of the Agreement fails this test.  Plaintiff has very little *legitimate* interest to protect with the Agreement, other than its interest in the documents and equipment provided to "licensees" and the maintenance of its intellectual property rights.  Each of these interests is fully accounted for by portions of the Agreement other than Section 12.3.  For example, the Agreement requires the return of all documentation and materials related to archery sports at its termination or expiration.  (Agreement §§ 2.2, 3.5, 6.2, at 2, 5, 7).  It also demands that "licensees" follow Plaintiff's detailed instructions regarding the use of Plaintiff's supposed intellectual property, and further demands that the "licensee" never challenge the validity of any of Plaintiff's trademark or patent registrations.  (*Id.* § 2.1, 2.2, 2.6, at 2. 3).

Section 12.3 is not rationally related to any of these (arguably) legitimate interests of Plaintiff.  Instead, it baldly prohibits "licensees" from any business involvement in the broad field of archery sports, anywhere in the world, for a period of three years after the

termination or expiration of the license.  This incredibly broad set of restrictions is not

even arguably reasonable to protect Plaintiff's legitimate interests.  Section 12.3 further

does not attempt to limit itself to protecting any confidential information related to

archery sports—it is not limited to use of any proprietary "secret ingredient" of Plaintiff's

archery game, but applies to *any* archery sports game using *any* equipment, and applies to

clearly public and non-secret information like the manner of setting up the field and the

rules of the game.  Section 12. 3 has no geographic limitation, and applies regardless of

whether the conduct is in a geographic area in which Plaintiff does business.

 "[I]n order '[t]o demonstrate a legitimate protectable interest, "an employer must

show some reason why it would be unfair to allow the employee to compete with the

former employer."'  Indeed, 'the employee should only be enjoined if he has gained some

advantage at the employer's expense which would not be available to the general

public.'"  Clark's Sales, 4 N.E.3d at 780-81 (quoting *Pathfinder Communications Corp.*

*v. Macy*, 795 N.E.2d 1103, 1110 (Ind. Ct. App. 2003) (citation omitted); *Norlund v.*

*Faust*, 675 N.E.2d 1142, 1154 (Ind. Ct. App. 1997), *clarified on reh'g*, 678 N.E.2d 421,

*trans. denied*).   Plaintiff does not allege just what advantage Defendants gained solely by

its short-lived affiliation with Archery Tag that would make it unfair for Defendants to

participate in any way generally in archery sports.

 Simply being in the business of selling archery equipment is not enough, since that

general skill or advantage, to the extent it was acquired solely during the affiliation,

would be the same regardless of the brand the Defendant had sold and is not the type of

skill or advantage a non-compete can legally bar someone from using.  *See, e.g.*,

Pathfinder, 795 N.E.2d at 1110 (quoting *Duneland Emergency Physician's Med. Group,*

*P.C. v. Brunk*, 723 N.E.2d 963, 966 (Ind. Ct. App. 2000), *trans. denied* (quoting *Slisz v. Munzenreider Corp.*, 411 N.E.2d 700, 704 (Ind. Ct. App. 1980))) ("[A]n employee signing a restrictive covenant not to compete is entitled to utilize the general skills he has acquired in performing his job, and can only be prevented from doing so under circumstances where their use adverse to his employer would result in irreparable injury."). Accordingly, there is no articulable legitimate interest Plaintiff can claim that this sweeping restraint against competition is reasonably designed to protect.

Further, there is no straight-faced argument that can be made that this restriction is reasonably restrictive of the supposed "licensee" and not violative of public policy. On its face, Section 12.3 prohibits a "licensee" from engaging in any business "involving" the ownership *or* operation of an Archery Tag® field *or* a non-Archery Tag® field engaged in a similar game or activity. Section 12.3 goes far beyond preventing a supposed licensee from continuing to use Plaintiff's equipment or documents after the license term—it prevents a supposed licensee from having ***anything at all*** to do with archery sports ***anywhere in the world*** for a period of three years after the license ends. If this Court "find[s] the covenant not to compete unreasonable under any set of facts, it will be deemed to be unenforceable." *Young,* 449 N.E.2d 304. One need not look far to find a set of facts under which Section 12.3 is unreasonable. For example, each of the following circumstances would constitute a facial breach of Section 12.3:

- Jane Doe executes a license with Plaintiff on January 1, 2015 for operation of an Archery Tag field in Indiana. Jane terminates the license effective January 1, 2016. On June 1, 2018, Jane is approached by "Wallace, Inc.," an unrelated third-party company that wishes to lease acreage she owns in Scotland for Highland-themed recreational competitions including caber tosses, stone puts, mock hand-to-hand combat, and non-lethal archery sports. Jane agrees to lease 10 acres to Wallace. Jane is now "engaged in business involving the ownership or operation

12

of a field in which . . . a similar archery sport is played" in facial breach of the Agreement.

- Jane Doe executes a license with Plaintiff on January 1, 2015 for operation of an Archery Tag field in South Africa.  Jane suffers heavy losses, and, on the verge of bankruptcy, terminates the license effective January 1, 2016.  On June 1, 2016, Jane, in desperate need of employment, obtains a job offer from "Arrow Dodgers, Inc.," an unrelated third-party Ontario company operating in Canada.  Jane accepts full-time employment cleaning and mowing Arrow Dodgers' archery sports field.  Jane is now "engaged in business involving the ownership or operation of a field in which . . . a similar archery sport is played" in facial breach of the Agreement.

Each of these examples, and many more that can easily be imagined, demonstrate the radical overbreadth and unreasonableness of Section 12.3.  Because this covenant not to compete is unreasonably overbroad, this Court should refuse to enforce it, find that Plaintiff cannot raise a plausible claim to relief under Count I of the Second Amended Complaint, and dismiss Count I of the Second Amended Complaint.

### 2.   *The Noncompete Is Also Unreasonable under the Sale-of-Business Test*

Even if the relationship between the parties here could be analogized to a sale of a business, the covenant not to compete would still be unenforceable as a matter of law.  In the sale of business context, the threshold question for the reasonability of a noncompete is "whether a protectable interest has been purchased," and the overbreadth of the noncompete's provisions are measured with respect to that protectable interest according to a three part test:

(a)  whether the covenant is broader than necessary for the protection of the covenantee (here, [Plaintiff]) in some legitimate interest,

(b)  the effect of the covenant upon the covenanter ([Archery Sports]), and

(c)  the effect of the covenant upon the public interest.

*Fogle v. Shah*, 539 N.E.2d 500, 503 (Ind. Ct. App. 1989) (citing *Unishops, Inc. v. May's Family Centers, Inc*., 399 N.E.2d 760, 763 (Ind. Ct. App. 1980)).

A noncompete related to a service-oriented business "normally will be localized because services generally are performed within a small geographic area." *Id.* at 504 (citing Annot. 46 A.L.R.2d 119, 228-260 (1956)).

The Agreement fares no better under this more generous test than it does when evaluated according to an employment standard.  Plaintiff fails the threshold question—it has purchased no business at all from its purported "licensees," and thus has acquired no business interest properly protectable by a noncompete.  To the extent Plaintiff has a business interest in its documentation, goods, or intellectual property, those interests are fully protected by U.S. copyright, trademark, and patent law, and then redundantly protected by multiple contractual provisions within the Agreement other than the noncompete clause.

Section 12.3 is not tailored to further protect Plaintiff's goods, documents, or intellectual property; nor is it tailored to prevent a "licensee" from using Plaintiff's products in competition against Plaintiff (this would likely still be unreasonable).  Rather, Section 12.3 is expressly intended to prohibit any former "licensee" of Plaintiff's from having ***any*** business involvement ***at all*** in archery sports, anywhere in the world.  Plaintiff has no legitimate protectable interest in avoiding all competition.

Further, Section 12.3 has a devastating effect on covenantees and is detrimental to the public interest.  It is a complete prohibition on any involvement in an entire industry.  As shown in the "Jane Doe" examples, above, the excessive scope independently proves the clause's unreasonableness.

This Court should decline to enforce Section 12.3, should accordingly find that Plaintiff cannot raise a plausible claim to relief under Count I, and should accordingly dismiss Count I.

### C.  The Agreement is Unenforceable as Illegal and Against Public Policy

Indiana courts may and should refuse "to enforce private agreements that contravene statute, clearly tend to injure the public in some way, or are otherwise contrary to the declared public policy of Indiana." *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1129-30 (Ind. 1995).  "Where a properly formed agreement contravenes the public policy of Indiana . . . courts have traditionally said it is void and unenforceable." *Straub v. B.M.T. by Todd*, 645 N.E.2d 597 (Ind. 1994).  "[W]hether an agreement is void on public policy grounds is a question of law to be determined from the surrounding circumstances of a given case." *Id.*

The Agreement here is void on its face in contravention of the Indiana Franchise Act, and, more particularly, of the anti-fraud provisions of that Act, as set forth below.

### 1.  *The Agreement Is an Unlawful Franchise*

Indiana law defines a "franchise" as a contract by which:

(1)   a franchisee is granted the right to engage in the business of dispensing goods or services, under a marketing plan or system prescribed in substantial part by a franchisor;

(2)   the operation of the franchisee's business pursuant to such a plan is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; and

(3)   the person granted the right to engage in this business is required to pay a franchise fee.

Ind. Code § 23-2-2.5-1(a).

The Indiana Franchise Act applies if the offeree of the franchise contract is an Indiana resident. Id. § 23-2-2.5-2(a). Australia, however, has its own franchise act whose provisions in relevant part are virtually identical to those of the Indiana act.[8] Section 5 of Australia's Franchising Code of Conduct ("ACC" states that a franchise agreement is any agreement in which:

> a person . . . grants to another person the right to carry on the business of offering, supplying, or distributing goods or services in Australia under a system or marketing plan substantially determined, controlled, or suggested by the Franchisor or an associate of the Franchisor; and under which the operation of the business will be substantially or materially associated with a trade mark, advertising or commercial symbol owned, used or licensed by the Franchisor or an associate of the Franchisor; under which before starting or continuing the business, the Franchisee must pay or agree to pay to the Franchisor or an associate of the Franchisor an amount including:
>
> > (a) an initial capital investment feel;
> > (b) a payment for goods or services . . .

(ACC sec. 5.1, attached as Exhibit A.)

The Agreement indisputably qualifies itself as a "franchise" under Indiana law. The Agreement emphasizes that "licensees" are granted the right to engage in the business of dispensing services. (Agreement §2.1, at 2 ("Licensor hereby grants to Licensee . . . [a] revocable license to operate and use the Archery Tag® System at a single location.")). The Agreement also specifies that the business is under a marketing plan **and** a system prescribed in substantial part by Plaintiff. (*See* Agreement § 5.1, at 6 (indicating that Plaintiff will provide marketing information and advice to be used by "licensee"); *see*

---

[8] This definition is functionally identical to Indiana's definition. Thus, a franchise act applies—whether that of Indiana or that of Australia is largely immaterial to the result. Defendants will proceeding with reference to Indiana statute, with the understanding that the ACC is provides in relevant part virtually identical requirements.

*also id.* §§ 2.2, 2.6, 6.1, 6.2, at 2, 3, 6, 7 (requiring "licensees" to use the equipment provided by Plaintiff, to use Plaintiff's trademarks, and to conduct archery sports recreational activities in accordance with Plaintiff's "mandatory specifications, standards, and operating procedures . . . set forth in the Archery Tag® Operations Manual.")).  The Agreement specifies that the "licensee's" operation of the business not only may be, but must be associated with Plaintiff's trade names, logo, type, advertising, and other commercial symbols, which the Agreement purports to license and sets forth and discusses in detail.  (*Id.* §§ 2.0, 2.2, 6.1, at 2, 6).

The Agreement also purports to license the use of a number of United States patents and trademarks to the nominal licensee.  (Agreement §§ 2.0, 2.2, at 2).  The Agreement demands a "franchise fee" in the form of an initial payment and regular "annual" payments thereafter required for the "licensee" to continue to conduct business. (*Id.* §§ 4.1, 4.2 at 5 ; *see also* Ind. Code § 23.2-2.5-1(i) ("Franchise fee means any fee that a franchisee is required to pay directly or indirectly for the right to conduct a business to sell . . . services.").

Thus, the Agreement satisfies all three statutory conditions of the Indiana Franchise Act, and is a "franchise."[9]  The Court can take judicial notice of the fact that Plaintiff is not registered as a franchisor.[10] Accordingly, the Agreement exists in violation of Indiana law.

---

[9] See supra, footnote 8.

[10] A search for Plaintiff's name at the Indiana Secretary of State's securities database for franchisors returned no results.  *See* http://www.in.gov/apps/sos/securities/sos_securities.  This Court may take judicial notice of these online state records.  *See, e.g.*, *Buck v. Bayer Healthcare Pharm., Inc*., No. 1:10–cv–36, 2010 WL 623529, at *1 n.3 (N.D. Ind. Feb.18, 2010) (considering online records from the websites of the Indiana and Pennsylvania Secretaries of State and concluding

### 2.   *The Agreement Facially Violates the Anti-Fraud Statute and Public Policy*

If an agreement directly contravenes a statute, then "the court's responsibility is to declare that contract void." *Continental Basketball Association, Inc. v. Ellenstein Enterprises, Inc.*, 669 N.E.2d 134, 139 (Ind. 1996).[11]

Fraud, within the context of the franchise statute, is defined to include "any misrepresentation in any manner of a material fact, any promise or representation or prediction as to the future not made honestly or in good faith, or the failure or omission to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading." Ind. Code § 23-2-2.5-1(f).[12]

---

the court may take judicial notice of online records of corporations) (citing *Colon v. SmithKline Beecham Corp.*, 2010 WL 46523, at *3 (S.D. Ill. Jan. 5, 2010), *Bova v. U.S. Bank, N.A.*, 446 F. Supp. 2d 926, 930 n.2 (S.D. Ill. 2006)). *Accord L'Garde, Inc. v. Raytheon Space & Airborne Sys.*, 805 F. Supp. 2d 932, 937-38 (C.D. Cal. 2011) (taking judicial notice of online records from the California Secretary of State since just as public records and government documents are generally considered "not to be subject to reasonable dispute," so too does this include "[p]ublic records and government documents available from reliable sources on the Internet." (quoting *Hansen Beverage Co. v. Innovation Ventures, LLC*, No. 08–CV–1166–IEG, 2009 WL 6597891, at *1 (S.D. Cal. Dec. 23, 2009) (citing *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999))).

[11] *Continental* also involved an unlawful franchise contract.  In that case, the Court found that an unregistered franchise agreement was not "directly" in contravention of a statute so as to justify voiding the agreement.  Accordingly, the Court applied a factually-based analysis.  *See Continental*, 669 N.E.2d at 139.  But *Continental* did not address a circumstance where, as here, a contract is *both* an unlawful unregistered franchise *and*, on its face, contravened the fraud provisions of the Franchise Act.  *Continental*'s fact-based analysis is therefore not applicable here, and the bright-line rule of deeming void an agreement that directly contravenes statute should apply.

[12] The ACC has a similarly broad requirement that the franchisor act "with good faith, within the meaning of the unwritten law from time to time."  (Ex. B, ACC sec. 6(1)).  Australian law defines the obligation of good faith to include "whether a party has acted honestly and not arbitrarily."  (Id. at sec. 6(3)).  This positive obligation to act "honestly" even broader than the Indiana Franchise Act's prohibition against "fraud."  The Agreement violates both statutes.

The allegations of the Second Amended Complaint, along with the text of the Agreement, demonstrate that Plaintiff misrepresented the nature of the rights it was capable of licensing to Defendants and deceptively suggests that Defendants needed Plaintiff's permission to operate an archery sports business in Australia.  At minimum, the Agreement defrauded Defendants by omitting material facts necessary for Defendants to understand that Plaintiff had no legal rights in Australia that it could enforce or offer to license.

Specifically, the Agreement supposedly "licenses" the use of the "ARCHERY TAG®" trademark and demands that "licensees" like Defendants use that mark in a variety of ways.  (Agreement §§ 2.6; 6.1).  The Agreement also supposedly "licenses" a patent on non-lethal arrows and demands that no other arrow be used.  (*Id.* § 2.2).  The Second Amended Complaint itself contends that the reason Defendants entered into the Agreement was "so that it could receive a license grant to Global's proprietary intellectual property . . . ." (SAC ¶ 36, at 8).

The Second Amended Complaint and Agreement both emphasize the importance of the issuance of a "license" to Plaintiff's "Archery Tag®" registered trademark.  The ® designation is an express statement ***under the laws of Australia*** as well as those of the U.S. that the trademark rights are officially registered.  *See https://www.ipaustralia.gov.au/trade-marks/understanding-trade-marks/benefits-trade-marks*.  However, on December 31, 2014, the date of execution of the Agreement, Plaintiff's ARCHERY TAG® trademark registration and rights were purely products of U.S. law and were geographically limited to U.S. commerce.  *See* 15 U.S.C. § 1127 (limiting application of U.S. trademark rights to commerce regulated by Congress.).

Plaintiff did not at that time—or at any time during the pendency of the Agreement—possess a registered "Archery Tag" trademark in Australia.[13]  The Agreement's express representation that Plaintiff had a "registered" Archery Tag mark and that it could "license" that mark to Defendants *in Australia* was indisputably false.

Further, the Agreement facially misleads by creating the impression that foreign entities like Defendants are required to purchase a license from Plaintiff to conduct archery sports activities or use the phrase "Archery Tag" ***in Australia*,** at a time when Plaintiff held no trademark rights in Australia it was capable of licensing and at a time when Defendants would, had the truth been known, been free to use the phrase "Archery Tag" without Plaintiff's permission and without any legal violation of its rights.  The Agreement's deception about foreign entities' need for "permission" in areas where Plaintiff has neither the power nor the right to prohibit activity is additionally fraudulent.

Similarly, the Agreement "licenses" the use of Plaintiff's "patented" arrows.  The patent specified, however, is a United States patent.  It also is a creation of United States law that exists and can be enforced only against conduct occurring within U.S. borders or against products imported into the U.S.  *See, e.g.*, *Rotec Indus., Inc. v. Mitsubishi Corp*., 215 F.3d 1246, 1251 (Fed. Cir. 2000) (ignoring extraterritorial activities as "irrelevant" since "[t]he right conferred by a patent under our law is confined to the United States and its territories, and infringement of this right cannot be predicated of acts wholly done in a

---

[13] The Court may take judicial notice of the Australian Trademark Office's electronic website, which details that Global Archery Product obtained an "Archery Tag" registration in Australia on March 22, 2016, nearly four months after termination of the Agreement.  A copy of the specific search result is attached as Exhibit B for the convenience of the Court, although the Court may also take notice of the Australian Trademark Office's publicly available web-based database at http://pericles.ipaustralia.gov.au/atmoss/falcon.application_start.

foreign country") (quoting *Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.*, 235 U.S. 641, 650 (1915) (citation omitted)).  Defendants could, for example, have made or purchased arrows identical to Plaintiff's "patented" arrows, and so long as those arrows were acquired from a non-U.S. source and used in Australia, Plaintiff's legal rights would not been in any way implicated.  In other words, the Agreement facially indicates that Defendants need a license from Plaintiff to use non-lethal arrows of a certain type in Australia, when the truth is that Plaintiff had no legal ability to stop Defendants from using non-lethal arrows of any type in Australia and could not grant Defendants a license to do anything in Australia that Defendants did not already have a legal right to do.

The Agreement (as it existed during the relevant time period here) fraudulently misrepresented that everyone in the world was required to obtain Plaintiff's permission to use certain trademarks like Archery Tag® or to use non-lethal arrows of a certain type, when, in truth, Plaintiff had no authority to grant or deny such permission outside of the United States and had no intellectual property rights to license in Australia and other areas outside of the United States.  At minimum, the Agreement, offered worldwide, failed to explain that the rights it purports to "license" were territorially limited to the United States.  The Agreement relatedly fails to explain that the "registration" to which it refers is a U.S. registration (and not a registration in the licensee's country).

The Agreement is thus not only an unlawful franchise contract—it is an unlawful franchise contract that is fraudulent on its face as to foreign franchisees.  Preventing such fraud is one of the core purposes of the Franchise Act.  This Court should find that Plaintiff has failed to raise a plausible claim of relief due to the unenforceability of the Agreement as a whole, and dismiss the Second Amended Complaint.

**D.  This Court Should Dismiss this Case Pursuant to the Mootness Doctrine**

Before a federal court can have jurisdiction over a matter, "a litigant must have

suffered, or be threatened with, an actual injury traceable to the defendant and ***likely to be***

***redressed by a favorable judicial decision***."  *Chafin v. Chafin*, 133 S.Ct. 1017, 1023

(2013) (citation and quotation omitted) (emphasis added).  Federal courts may not

"decide questions that cannot affect the rights of litigants in the case before them."  *Id.*

(quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)).  A case is moot, and the

Court lacks constitutional jurisdiction, once it can no longer "grant any effectual relief

whatever to the prevailing party."  *Knox v. Service Employees*, 132 S.Ct. 2277, 2288

(2012).

Here, the Second Amended Complaint demands an injunction preventing all

Defendants from engaging in any way or capacity with archery sports anywhere in the

world, and further asks for the Court to award it any profits made by Chris Firgaira and

any (unnamed) "third party with whom Firgaira has become a business partner" related in

any way to Archery Sports.  Both the injunction and the damages the Second Amended

Complaint demands are centrally linked to the noncompete provision of the Agreement.

However, as the Second Amended Complaint admits, the Defendants are citizens and

residents of Australia.  (SAC ¶¶ 3-8, at 1-2).  The Plaintiff alleges no U.S. contacts and

no business or assets in the U.S. on the part of any of the Defendants.  To obtain any

effective relief, Plaintiff would have to take a judgment issued by this Court and ask for

its enforcement in Australia.

First, Australian courts are unlikely to enforce any order by a U.S. court enjoining the

conduct of an Australian citizen within Australia. Generally, foreign judgments ordering

or prohibiting acts are not enforceable within Australia with the exception of some New Zealand judgments. *See* Kim Pham, *Enforcement of Non-Monetary Foreign Judgments in Australia*, 30 SYDNEY L. REV. 663, 666-68 (2008); *citing  Jackman v. Broadbent*, [1931] SASR 82 (South Australian Supreme Court confirmed that an foreign order for specific performance was enforceable under the Service and execution of Process Act 1901 (Cth) only to the extent that it was a judgment for costs); *Telesto Investments Ltd. v. UBS AG*, [2012] NSWSC 44, (Supreme Court of New South Wales stating that foreign non-monetary judgments will not be enforced by Australian courts) (attached as Exhibit C). "There appear to be no cases since [1875] in which a court of equity has enforced a non-monetary order such as specific performance or injunction," Pham, 30 SYDNEY L. REV. at 666-67 (footnote omitted), and, "[a]s was the case in 1808, it is unlikely that a plaintiff will be able to enforce a foreign nonmonetary Judgment in Australia," *id.* at 668.

Further, Australian courts look with exceptional disfavor on noncompetition agreements, considering them to be presumptively unenforceable restrains of trade.  "At common law, restraint of trade is contrary to public policy and void unless it can be shown that the restraint is . . . a reasonable one." *Informax International Pty Ltd v. Clarius Group Ltd.*, 192 FCR 210 (2011) (attached as Exhibit D); *see also Peters (WA) Ltd. v. Petersville Ltd*., 205 CLR 126 (2001) (attached as Exhibit E).  It thus seems likely, for the reasons discussed in Section III.B, *supra*, that an Australian court would decline to enforce Section 12.3 of the Agreement, and thus would be unlikely to enforce any judgment awarding even monetary damages for the breach of that Agreement.

Because Australian courts are unlikely to enforce any judgment by this Court enjoining Defendants' conduct within Australia or even for monetary damages tied to

breach of the Agreement's supposed noncompetition clause, this Court is not likely to be able to fashion an effective remedy, the case is moot, and it should be dismissed.

## IV.  CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court dismiss in its entirety the Second Amended Complaint with prejudice.

Respectfully submitted,

BARRETT MCNAGNY LLP

By   /s/ Jeremy N. Gayed
     Jeremy N. Gayed, #27551-35
     215 East Berry Street
     Fort Wayne, Indiana  46802
     Tel: (260) 423-9551
     Fax: (260) 423-8920
     Email: jng@barrettlaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th of June, 2016, the foregoing document was filed electronically through the Court's CM/ECF system. Notice and a copy of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

     /s/ Jeremy N. Gayed
     Jeremy N. Gayed